IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA L. HAMILTON,                          :
individually and on behalf of                  :
C.P., a minor child, as mother and             :        No. 4:04-CV-01570
general guardian,                              :
                                               :
            Plaintiffs,                         :        (Judge McClure)
                                               :
      v.                                        :
                                               :
UNITED STATES DEPARTMENT OF                     :
HOUSING AND URBAN                               :
DEVELOPMENT and                                 :
SCRANTON HOUSING AUTHORITY,                     :
                                               :
            Defendants.                         :

**M E M O R A N D U M**

June 23, 2006

**BACKGROUND:**

      This is a housing discrimination case.  On July 19, 2004, plaintiff Barbara

Lynne Hamilton, proceeding pro se, filed a civil complaint on behalf of herself and

her minor child, C.P..[1]  The complaint alleges that the defendants violated the civil

---

[1]  A parent may not represent her child pro se in a federal lawsuit.  See Osei-Afriyie by Osei-Afriyie v. Med. Coll. of Pa., 937 F.2d 876, 883 (3d Cir. 1991) (holding that the father "was not entitled, as a non-lawyer, to represent his children in place of an attorney in federal court.").  We need not confront that issue, as plaintiffs were represented at trial by two attorneys acting pro bono.  However, Barbara Hamilton's minor child C.P. is not a competent party.  Federal Rule of Civil Procedure 17(b) provides that the competency of parties to sue or be sued is

and constitutional rights of Hamilton and her child, as well as the Fair Housing Act

("FHA"), by denying their application for housing on February 18, 2004.  Hamilton

and her daughter are African-American Indian.

　　　We denied Hamilton's initial request for appointment of counsel.  (Rec. Doc.

No. 6.)  On December 13, 2004, we granted the motion to dismiss filed by

defendant United States Department of Housing and Urban Development.  (Rec.

Doc. No. 20.)  On February 25, 2005, we denied the motion to dismiss filed by

defendant Scranton Housing Authority, except to the extent plaintiffs sought

injunctive relief.  (Rec. Doc. No. 26.)

　　　We scheduled a non-jury trial for November 29, 2005.  On November 23,

2005, the court received a letter from Hamilton asking that an attorney be appointed

---

determined by the law of the individual's domicile.  Plaintiffs are domiciled in
Pennsylvania.  Under Pennsylvania law, a plaintiff who is a minor (defined as a
person under the age of eighteen years) must be represented by a guardian who
supervises and controls the action on her behalf.  See Pa. R. Civ. P. 2027 (actions
by and against minors); Pa. R. Civ. P. 76 (defining "minor" and "majority"); see
also Kedra v. City of Phila., 454 F. Supp. 652, 661 n.4 (E.D. Pa. 1978) (mother
may act as representative of her minor children, who lack capacity to sue).
　　　Federal Rule 17(c) provides that "[w]henever an infant or incompetent
person has a representative, such as a general guardian . . . the representative may
sue or defend on behalf of the infant or incompetent person."  Although the caption
was not technically correct in naming C.P. as an independent party, it is clear that
Hamilton has brought the case on behalf of herself and her child.  We will therefore
direct the clerk to correct the caption to read "Barbara L. Hamilton, individually
and on behalf of C.P., a minor child, as mother and general guardian."

for her.

Because a reassessment of the factors set forth in <u>Tabron v. Grace</u>, 6 F.3d 147 (3d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1196 (1994), weighed in favor of seeking counsel, we requested the <u>pro</u> <u>bono</u> chair of the Middle District of Pennsylvania Chapter of the Federal Bar Association to seek the services of a volunteer attorney to represent Hamilton and her daughter.  (Rec. Doc. No. 32.)

Attorneys Joseph A. Lach and Michael J. Kenny volunteered their time and expertise to plaintiffs in this matter.  We acknowledge our appreciation for the trial presentation and post-trial submissions of these <u>pro</u> <u>bono</u> attorneys, acting in the highest tradition of the profession.

After a case management conference on March 3, 2006, we scheduled a nonjury trial for March 24, 2006.  At trial, plaintiffs offered the testimony of Hamilton herself, as well as numerous documentary exhibits.  Defendant Scranton Housing Authority cross-examined Hamilton and submitted exhibits on its behalf. We directed the parties to file proposed findings of fact and conclusions of law, which they have done.

Below, we explain our decision that the Scranton Housing Authority violated the Fair Housing Act and the rights of Barbara Hamilton and her daughter.

**<u>DISCUSSION</u>:**

## I.  Findings of Fact

Barbara Lynne Hamilton and her minor daughter[2] are African-American Indian.  Hamilton, who is originally from Long Island, New York, has obtained her General Equivalency Diploma (GED), and she completed Police Academy training at Lackawanna College.  Hamilton also obtained certification as a Certified Nursing Assistant (CNA) from Marywood University.  Hamilton suffers from chronic asthma and receives Social Security Disability assistance.

As of August 2003, Hamilton and her daughter had resided in housing managed by the defendant Scranton Housing Authority ("SHA") for approximately four years.  During her residency in SHA housing, Hamilton made the acquaintance of Lawanda Oakley, a white woman with no children.  Hamilton and Oakley were friends at first, but their relationship unraveled.

A bizarre and unfortunate series of events began sometime in the fall of 2002, when Oakley began attacking Hamilton and vandalizing her property.[3]  Numerous police reports were filed, naming Oakley as the perpetrator and Hamilton as the

---

[2]  Hamilton's daughter is currently ten years old, but at the time of the relevant events she was seven years old.

[3]  No specific testimony regarding these events was offered at trial; we take these facts from the police reports, summonses, and criminal complaints attached by Hamilton to her complaint.  Their authenticity is uncontested.

victim of these assaults.  On October 7, 2002, Oakley struck Hamilton in the face and body with an open hand, and tore out Hamilton's screen windows causing damage.  On January 4, 2003, Oakley punched and kicked Hamilton, causing a wound to her head.  When police arrived on the scene, Hamilton was bleeding from the left side of her head and Oakley had to be restrained by police.

On January 8, 2003, Oakley sliced Hamilton's window screens and slashed her car tires.  On February 12, 2003, Oakley sliced holes in a number of Hamilton's window screens and attempted to enter Hamilton's apartment.  On April 4, 2003, Oakley threw a brick through a window of Hamilton's car.  On August 7, 2003, Oakley forced her way into Hamilton's apartment, attacked her, directed vulgar language and racial slurs at her, and threw a rock at a car owned by Hamilton's longtime boyfriend Thomas Pierce.[4]

In August 2003, Hamilton and her daughter terminated their tenancy at SHA.  Apparently around the same time, Lawanda Oakley also vacated her SHA apartment.  Hamilton and her daughter moved to Tioga County, Pennsylvania, where Hamilton and Thomas Pierce bought a trailer together.  However, Pierce became abusive and Hamilton obtained a restraining order against him pursuant to Pennsylvania's Protection From Abuse Act, 23 Pa. Cons. Stat. § 6101 et. seq..

---

[4]Pierce is the father of Hamilton's child.

Hamilton and her daughter left Pierce and the trailer in Tioga County, and returned to Scranton.  In Scranton, they moved into the Women's Resource Center ("WRC"), which "seeks to respond to and actively change the prevalence of domestic and sexual violence."[5]

The WRC supplies temporary housing to women and children; Hamilton and her daughter could not stay indefinitely.  In need of a permanent home, Hamilton reapplied to the SHA on January 27, 2004.  It is uncontested that at the time of her application, SHA had available apartments suitable for Hamilton and her daughter.[6]

When Hamilton applied to the SHA, she completed a "Questionnaire For Preference," indicating that she was a victim of domestic violence and was homeless.  (See Pl.'s Ex. 9.)  The questionnaire states that the SHA "will give priority in the selection of applicants from the public housing waiting list" and lists a

---

[5]  Women's Resource Center, http://www.wrcnepa.org/about/mission.php (last visited June 1, 2006).

[6]  As described below, Oakley applied for housing at or about the same time as Hamilton, and was approved.  At trial and in its post-trial submissions, the SHA placed emphasis on the fact that Hamilton and Lawanda Oakley would be categorized differently in their housing needs due to the composition of their households (i.e., Hamilton would need a two-bedroom apartment, which is in greater demand, because she has a seven year-old daughter, and Oakley would need only a one-bedroom apartment, as a single individual).  However, the SHA did not contest Hamilton's testimony that there were apartments available at the time she applied that would be suitable for her and her daughter.

6

weight for each of nine preferential categories.  (Id.)  The highest weight is eight,

delegated to a person "who is involuntarily displaced from his/her home as a result

of fire, disaster, or government action."  Between her two preferences, Hamilton

had a weight of nine.

As a routine part of its evaluation of applications, the SHA performed a

criminal background check on Hamilton.  It revealed that she had no criminal

record.  (See Pl.'s Ex. 6.)  The SHA also sent a "Rental History" questionnaire to

the manager of Hamilton's former apartment with SHA.  The manager answered

that Hamilton had not been destructive to the apartment or surrounding public

areas, and that Hamilton got along with other tenants and neighbors.  Hamilton's

former apartment manager stated that she would rent to Hamilton in the future.

(See Pl.'s Ex. 3.)

Despite the availability of suitable apartments, despite Hamilton's preferential

status, despite having a spotless criminal record, and despite her former apartment

manager's statement that she would rent to Hamilton, the SHA denied Hamilton's

application in a letter dated February 18, 2004.  (Pl.'s Ex. 1.)  The letter stated "we

find you are ineligible for the following reason: due to prior criminal activity."[7]  (Id.)

---

[7]  When she received the letter rejecting her application for housing, Hamilton
went to the SHA office immediately, but was unable to find anyone with whom she
could discuss her application.  She called a Mr. Baker, executive director of the

At trial, the SHA introduced a document entitled "Scranton Housing Authority Admission and Occupancy Policy For The Public Housing Program" (the "Policy"). (Def.'s Ex. 3.) In a section listing "other criteria for admission," the Policy states that "[f]amily must not engage in drug-related criminal activity or violent criminal activity, including criminal activity by any family member." (Id. at 12.) The Policy goes on to define "violent criminal activity":

> Violent criminal activity includes any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force against the person or property of another.
> For the purpose of this policy, this is construed to mean that if a member of the current family has been arrested or convicted within the prior 7 years for this purpose, they will be determined to have engaged in drug-related criminal activity or violent criminal activity."

(Id. at 13.)

Hamilton's only involvement with "criminal activity" was her role as victim in the Lawanda Oakley saga. There is no evidence that Hamilton has ever been "arrested or convicted" of any crime. (Id.) The record reveals that Hamilton's

---

SHA, who requested that Hamilton provide proof that she was not the perpetrator of criminal activity at Hamilton's former address with the SHA. Because she was under the stress of homelessness, and because it cost money to obtain the public records requested by Baker, Hamilton did not provide the requested documents until April 27, 2004. (See Def.'s Ex. 1.)

only exposure to the criminal justice system has been her training at the Police

Academy, other coursework in criminal justice, and her status as a victim of the

assaults perpetrated by Lawanda Oakley.

At trial and in their post-trial submissions, the SHA argued for a distinction

between a "criminal background check" and "criminal activity." (See Tr. at 73;

Def.'s Br. at 4-5.) The SHA proposes that the absence of arrests or convictions in

Hamilton's criminal history does not mean that she was not somehow involved in

"criminal activity." The SHA argued in its brief that Hamilton's former SHA

apartment

> was the center of criminal activity on multiple occasions.
> Criminal activity is not some conjured up [sic] phrase by
> Defendants. It is one of the established criteria for denial
> of housing to a potential applicant. Defendant never
> alleged that all the criminal activity was committed by Ms.
> Hamilton rather that all of the activity occurred at her
> prior residence . . . . Plaintiff's prior apartment was a
> security concern due to the prior criminal activity at that
> location.

(Rec. Doc. No. 49, at 4-5.)

Thus, the SHA used against Hamilton and her daughter Hamilton's status as

the victim of a series of crimes.[8]  The SHA essentially states that because Hamilton

---

[8]  The SHA also offered an incident report from March 21, 2003, showing
that Hamilton called SHA security because an unknown person was knocking on
her door at one o'clock in the morning. (Def.'s Ex. 4.) Nothing in the report

was the victim of the assaults described above, she and her daughter were ineligible for housing. Nowhere in the SHA Policy does it state that victims of crimes are ineligible for housing because of the victim's inextricable connection to "criminal activity."

The SHA's position is untenable. Lawanda Oakley, the white woman who perpetrated the string of senseless violent attacks against Hamilton, was approved for housing by the SHA at the same time Hamilton was denied. The SHA performed a criminal background check on Oakley, which revealed that Oakley had been arrested for assault and harassment on two separate occasions. (Def.'s Ex. 5.) The SHA claims to have rejected Hamilton's application because she was the victim of numerous crimes. However, the SHA approved the application of the white woman who had physically assaulted Barbara Hamilton, had vandalized Hamilton's property, had broken into Hamilton's apartment, and had been charged with crimes committed during those incidents.

When the SHA rejected Hamilton's application, she and her daughter had nowhere to live. Her time at the Women's Resource Center was expired. She could not return to the trailer in Tioga County because she feared that Pierce would be abusive. Hamilton had no family in the area. She testified to a period of time

---

reveals that <u>anyone</u> involved in that incident engaged in any sort of criminal activity.

during February and March when she and her daughter were homeless.  Hamilton described the experience as "a nightmare," the "lowest time in [her] life," and "scary."  (See Tr. at 47-50.)  Although it is unclear whether Hamilton and her daughter physically slept in the open air during their ordeal, it is clear that the mother and daughter did not know from one day to the next where they would sleep, and where or what they would eat.

Hamilton testified that her child "is a wreck" due to the experience.  Hamilton testified, "I literally have to rock her to sleep still.  I mean, my child has nightmares behind this."  (Tr. at 49.)  Hamilton also testified that her child had to go to counseling as a result of the homeless episode.

Ultimately, because they had nowhere else to go, Hamilton and her daughter returned to Pierce and the trailer in Wellsboro.  Forced with a choice between homelessness and an abusive relationship, Hamilton chose the latter as her "last resort" in order to maintain a permanent address and keep her child in school.  (Tr. at 40.)

In addition to the foregoing factual narrative, we make the following findings of essential facts pursuant to Federal Rule of Civil Procedure 52:

1.      Barbara Hamilton and her minor child are African-American Indian.

2.      Lawanda Oakley is a white woman.

3.      As of August 2003, Hamilton and her daughter had lived in SHA

        housing for approximately four years.

4.      During the latter part of her tenancy in SHA housing, Hamilton was the

        victim of a series of violent assaults and property vandalism, all

        perpetrated by Oakley.

5.      In August 2003, Hamilton and her daughter moved out of SHA

        housing and into a trailer with Hamilton's longtime boyfriend, Thomas

        Pierce, in Tioga County, Pennsylvania.

6.      Hamilton and her daughter left the trailer when Pierce became abusive;

        Hamilton obtained a restraining order against Pierce pursuant to

        Pennsylvania's Protection From Abuse Act.

7.      After leaving the trailer, Hamilton and her daughter moved into the

        Women's Resource Center in Scranton, Pennsylvania.  The WRC

        provides temporary housing to women and children.

8.      On January 27, 2004, Hamilton applied to the SHA for an apartment.

9.      At the time of her application, the SHA had available apartments

        suitable for Hamilton and her daughter.

10.     Hamilton was entitled to priority placement in SHA housing, as she

        was homeless and the victim of domestic violence.

11.   The SHA performed a criminal background check on Hamilton, which

      revealed that Hamilton had no criminal record.

12.   Hamilton's former apartment manager at SHA completed a

      questionnaire stating that she would rent to Hamilton in the future.

13.   The SHA denied Hamilton's application on February 18, 2004, "due

      to prior criminal activity."

14.   Hamilton's only involvement with criminal activity was her role as

      victim in the attacks perpetrated by Lawanda Oakley.

15.   At or about the same time Hamilton's application was denied by the

      SHA, Lawanda Oakley reapplied to the SHA and was approved.

16.   The SHA performed a criminal background check on Oakley, which

      revealed that Oakley had been arrested for assault and harassment on

      two separate occasions.

17.   Because she was denied housing by the SHA, Hamilton and her

      daughter were rendered homeless for a period of weeks during the

      months of February and March, 2004.

18.   As a last resort, Hamilton and her daughter returned to Pierce and the

      trailer in Tioga County.

19.   The period of homelessness caused extreme mental and emotional

distress, anguish, humiliation, embarrassment, and anxiety in Hamilton and her daughter.

20.    Hamilton's daughter suffers nightmares and had to receive counseling as a result of her time spent in homelessness.

## II. Applicable Law

Hamilton brings her claim under the Fair Housing Act, 42 U.S.C. § 3601 <u>et. seq.</u>, also known as Title VIII of the Civil Rights Act of 1968. "The Fair Housing Act was designed to provide nationwide fair housing to minorities who had previously been victims of invidious racial discrimination, and is a valid exercise of congressional power under the Thirteenth Amendment to eliminate badges and incidents of slavery." <u>Mitchell v. Cellone</u>, 389 F.3d 86, 87-88 (3d Cir. 2004) (citing <u>Jones v. Alfred H. Mayer Co.</u>, 392 U.S. 409, 439-40 (1968)). "This legislation makes it the policy of the United States to eliminate all instances of racial discrimination in housing." <u>Id.</u> Private enforcement of the FHA is authorized by 42 U.S.C. § 3613(a); <u>see also</u> <u>Mitchell</u>, 389 F.3d at 89-92.

Here, the relevant language of the FHA provides that "it shall be unlawful . . . [t]o . . . make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Under this section, "a plaintiff my establish a prima facie case by showing discriminatory

effect without a showing of discriminatory intent." Rizzo, 564 F.2d at 148, n.32.

Alternatively, a plaintiff may show that the challenged actions were motivated by

intentional discrimination.  See Doe v. City of Butler, Pa., 892 F.2d 315, 323 (3d

Cir. 1989) (citing Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032 (2d Cir. 1979));

Eastampton Ctr. v. Twp. of Eastampton, 155 F. Supp. 2d 102, 111 (D.N.J. 2001).


Here, Hamilton argues that she was the victim of intentional discrimination.

Hamilton must therefore show that "discriminatory intent against a protected group

was a motivating factor for the challenged action." Eastampton Ctr., 155 F. Supp.

2d at 111 (citing LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 415 (2d Cir. 1995)).

Determining "whether invidious discriminatory purpose was a motivating factor

demands a sensitive inquiry into such circumstantial and direct evidence of intent as

may be available." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S.

252, 266 (1977); Rizzo, 564 F.2d at 143.

To find discriminatory intent, we weigh a number of factors: (1)

discriminatory impact of the challenged practice or policy; (2) the historical

background of the challenged decision; (3) the "sequence of events leading up to

the challenged decisions"; (4) departures from "normal procedural sequences"; and

(5) departures from normal substantive criteria.  Arlington Heights, 429 U.S. at 265;

Rizzo, 564 F.2d at 143; Eastampton Ctr., 155 F. Supp. 2d at 111.

Once the plaintiff makes out a prima facie case under the FHA, the burden

shifts to the defendant to justify its actions.  Rizzo, 564 F.2d at 148-49.  "[A]

justification must serve, in theory and practice, a legitimate, bona fide interest of the

Title VIII defendant, and the defendant must show that no alternative course of

action could be adopted that would enable that interest to be served with less

discriminatory impact."  Id. at 149.  "If the Title VIII prima facie case is not

rebutted, a violation is proved."  Id.

### III.  Analysis and Conclusions of Law

The unrebutted testimony of Barbara Hamilton and the exhibits submitted by

the parties show that the Scranton Housing Authority departed from its own

policies and procedures by denying Hamilton and her daughter housing, while

contemporaneously approving Lawanda Oakley for housing.

Hamilton showed that she was entitled to preference in housing due to her

status as a homeless victim of domestic violence.  The SHA's own policy states

that the SHA "will give priority in the selection of applicants from the public

housing waiting list" based on their answers on the preference questionnaire.  (Pl.'s

Ex. 9) (emphasis added).  Nevertheless, Hamilton was denied housing, and Oakley,

who was not entitled to any preference, was approved.  The SHA did not justify its

failure to follow its own policy.

Hamilton also showed that she had a clean criminal history, and that she had not been involved in "criminal activity" during her prior tenancy with the SHA. Hamilton further proved that Oakley had been arrested and charged with crimes while living in SHA housing.  Nevertheless, the SHA approved Oakley for housing at or about the same time it denied Hamilton.

In Appendix I to the SHA Admission and Occupancy Policy ("Guidelines for Evaluating Criminal Histories of Applicants"), the policy provides that "SHA's approval or denial of an application will be based on the criminal activity engaged in, and is not dependent upon any action or inaction by any law enforcement agency, district attorney, or court."  (Def.'s Ex. 3, at 124) (emphasis added).  This language provides for some flexibility in SHA's decisionmaking process; however, the evidence before the court shows that Hamilton did not "engage[] in" criminal activity at SHA housing, while Oakley clearly did.

The SHA's attempt to explain these decisions is unconvincing.  In its brief, the SHA stated that the parties "clearly established that the prior residence of Plaintiff . . . was the center of criminal activity on multiple occasions."  (Rec. Doc. No. 49, at 4.)  Hamilton's prior residence with SHA was a "center of criminal activity" because Oakley perpetrated a string of violent crimes against Hamilton at

17

Hamilton's apartment.  Hamilton never "engaged in" criminal activity.  The SHA

has not provided a plausible, nondiscriminatory reason for its contemporaneous

decisions denying housing to crime victim Hamilton, while approving housing for

crime perpetrator Oakley.

Hamilton established a prima facie case of intentional discrimination, based

upon departures from SHA's "normal procedural sequences" and departures from

the normal substantive criteria used by SHA to make housing decisions, which

show that discriminatory intent against a protected group was a motivating factor in

the denial of Hamilton's housing application.  See Arlington Heights, 429 U.S. at

265 ("Departures from the normal procedural sequence . . . might afford evidence

that improper purposes are playing a role.  Substantive departures too may be

relevant, particularly if the factors usually considered important by the

decisionmaker strongly favor a decision contrary to the one reached."); Rizzo, 564

F.2d at 143; Eastampton Ctr., 155 F. Supp. 2d at 111.

The SHA did not rebut the prima facie case by justifying its actions.

Hamilton has therefore proved a violation of the Fair Housing Act, and we will enter

judgment in favor of her and her minor child, and against the SHA.

In addition to the foregoing narrative application of law to fact, we provide

the following conclusions of law pursuant to Fed. R. Civ. P. 52:

18

1.     The plaintiffs established a prima facie case of intentional

       discrimination based upon the SHA's departures from "normal

       procedural sequences" and departures from the normal substantive

       criteria used by SHA to make housing decisions.

2.     The SHA failed to rebut plaintiffs' prima facie case.

3.     The SHA intentionally discriminated against plaintiffs on the basis of

       their race.

4.     The actions of the SHA constituted a reckless and callous indifference

       to the federally protected rights of Barbara Hamilton and her minor

       child.

## IV.  Damages and Costs

The Fair Housing Act expressly provides that prevailing plaintiffs may recover actual and punitive damages.  "[I]f the court finds that a discriminatory housing practice has occurred . . . the court may award to the plaintiff actual and punitive damages . . . ."  42 U.S.C. § 3613(c)(1).  Furthermore, the court "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs."  42 U.S.C. § 3613(c)(2).

Plaintiffs did not discuss the issue of damages in any detail.  In a footnote, plaintiffs stated that

> [Hamilton] and her daughter should be compensated for
> all of the emotional trauma this ordeal has caused;
> humiliation and fear and homelessness and counseling for
> her daughter.  At a minimum, some form of damages
> must be awarded, and Plaintiff submits punitives should
> be assessed to guard against such callous indifference
> being visited on another in the future.

(Rec. Doc. No. 47, at 10, n.4.)  As Local Rule 8.1 prohibits plaintiffs from

"claim[ing] any specific sum where unliquidated damages are involved," plaintiffs

did not suggest an appropriate amount of damages.  Defendant never addressed the

issue of damages.

We find that an award of $7,500 each in compensatory damages to Hamilton

and her minor child is fair and equitable under the circumstances.  The mother and

daughter spent approximately one month in homelessness.  The period of

homelessness caused extreme mental and emotional distress, anguish, humiliation,

embarrassment, and anxiety in Hamilton and her daughter. Hamilton's daughter had

to receive counseling because of the incident, and continues to suffer nightmares.

Hamilton herself had to make the last-resort decision to return to an abusive

relationship to escape the uncertainty of homelessness.

The plain language of 42 U.S.C. § 3613(c)(1) provides for punitive damages,

and "beyond a doubt," punitive damages can be awarded in a civil rights case

where a constitutional violation is found.  See Alexander v. Riga, 208 F.3d 419, 430

(3d Cir. 2000) (citing <u>Curtis v. Loether</u>, 415, U.S. 189 (1974)).

We may assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Id.</u> at 431 (quoting <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983)). "'Malice' and 'reckless indifference,' in this context . . . refer not to the egregiousness of the landlord's conduct, but rather to the landlord's knowledge that it may be acting in violation of federal law." <u>Id.</u> (citing <u>Kolstad v. Am. Dental Assoc.</u>, 527 U.S. 526 (1999)). "The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind, making a showing of egregious or outrageous discrimination unnecessary." <u>Id.</u> (internal quotations omitted).

Here, Hamilton established a prima facie case of intentional discrimination, and the SHA failed to rebut the prima facie case by justifying its actions. In direct contravention of its own policy regarding preference, the SHA denied housing to a black woman who was entitled to preference, while approving for housing a white woman who was not entitled to preference. Furthermore, the SHA denied housing to a black woman with no criminal history, and approved a white woman with a criminal history that, at least in part, is comprised of crimes perpetrated against Hamilton. The SHA then attempted to brand Hamilton as a criminal due solely to

her inextricable connection to "criminal activity" by virtue of her role as crime victim.  These actions reveal the SHA's "reckless or callous indifference to the federally protected rights" of Hamilton and her daughter.  See id.

The plaintiffs are entitled to punitive damages.  See id. (Holding that "because the jury's finding of a violation under the Fair Housing Act necessarily encompasses a finding of intentional discrimination, the plaintiffs need not also demonstrate that the conduct was particularly egregious or malicious in order to obtain punitive damages.")  We find that Hamilton and her minor child are each entitled to punitive damages in the amount of $20,000 each.  We are satisfied that this award will deter future discriminatory conduct by the SHA.

We will order that the $27,500 awarded to Hamilton's minor child be placed in a trust.  Plaintiffs' attorneys will be directed to submit a proposed plan for the administration of the trust, and a proposed order providing for the payment of the child's share.  Counsel are referred to Pa.R.Civ.P. 2039.

We will also provide a time period within which plaintiffs' attorneys may file a motion with the court requesting "reasonable attorney's fee and costs," complete with appropriate documentation.  See 42 U.S.C. § 3613(c)(2).

## CONCLUSION:

For the foregoing reasons, we find that the Scranton Housing Authority

intentionally discriminated against Barbara Hamilton and her minor child.  In an

accompanying order, we will direct the clerk to correct the caption, enter judgment

in favor of the plaintiffs and against SHA, award compensatory and punitive

damages, direct plaintiffs' attorneys to submit a proposed plan for the

administration of the minor child's trust, and proposed order for payment, and

provide a time period within which plaintiffs' attorneys may file a motion requesting

reasonable attorney's fees and costs.


　　　　　　　　　　　　　　　s/ James F. McClure, Jr.
　　　　　　　　　　　　　　James F. McClure, Jr.
　　　　　　　　　　　　　　United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA L. HAMILTON,                    :
individually and on behalf of           :
C.P., a minor child, as mother and      :       No. 4:04-CV-01570
general guardian,                       :
                                        :
          Plaintiffs,                   :       (Judge McClure)
                                        :
     v.                                 :
                                        :
UNITED STATES DEPARTMENT OF             :
HOUSING AND URBAN                       :
DEVELOPMENT and                         :
SCRANTON HOUSING AUTHORITY,             :
                                        :
          Defendants.                   :

**O R D E R**

June 23, 2006

For all of the reasons set forth in the accompanying memorandum,


**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The clerk is directed to correct the caption to read "Barbara L.

       Hamilton, individually and on behalf of C.P., a minor child, as mother

       and general guardian."

2.     The clerk will be directed to enter judgment in favor of plaintiffs and

       against defendant Scranton Housing Authority.

3.      Barbara L. Hamilton, individually, is awarded $7,500 in compensatory

        damages, and $20,000 in punitive damages.

4.      Barbara L. Hamilton, as mother and general guardian of C.P., her

        minor child, is awarded $7,500 in compensatory damages, and

        $20,000 in punitive damages.

5.      The $27,500 awarded to Hamilton on behalf of her minor child shall be

        placed in a trust.

6.      Plaintiff's attorneys are directed to submit a proposed plan for the

        administration of and an order directing payment into the trust

        described in paragraph (5), within 14 days of the date of this order.

7.      Within 14 days of the date of this order, the attorneys for plaintiffs

        may file a motion with the court requesting "reasonable attorney's fee

        and costs," complete with appropriate documentation, consistent with

        42 U.S.C. § 3613(c)(2).

8.      The clerk is directed to defer entry of final judgment until further order

        of court.


                                        s/ James F.  McClure, Jr.
                                       James F. McClure, Jr.
                                       United States District Judge